UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In Re:<br><br>RICHARD J. SILVA,<br>            Debtor. | Chapter 7<br>Case No. 18-13128 |
| PETER B. TROWT and BEVERLY STORAGE<br>WAREHOUSE & TRAILER LEASING, INC.<br>            Plaintiffs,<br><br>        v.<br><br>RICHARD J. SILVA<br>            Defendant. | Adv. Proceeding No. |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

This is an adversary proceeding brought under 11 U.S.C. §101, *et. Seq.* (the "Bankruptcy Code"), including §§523, 105 and other applicable sections of the Bankruptcy Code, Bankruptcy Rules 7001, *et seq.*, the Massachusetts Local Bankruptcy Rules, and other applicable statutes, federal law, regulations and rules, state law and case law to determine the dischargeability of a debt.

## PARTIES, JURISDICTION AND VENUE

1.      On August 16, 2018, Richard J. Silva (the "Debtor," "Defendant," or "Debtor/Defendant") filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code, commencing the above-captioned Chapter 7 case.  The Debtor resides at 14 Dearborn Street, Unit 1, Salem, MA 01970.

2.      Peter B. Trowt, the above-named plaintiff ("Trowt"), resides at 3 Iverson Road, Beverly, MA 01915.  Trowt has filed a Proof of Claim in the amount of $710,601.65.  He is listed in the Debtor's Chapter 7 schedules as a judgment creditor in the amount of $377,460.84.

3.      Beverly Storage Warehouse & Trailer Leasing, Inc., the above-named Plaintiff ("BSWTLI"), is a Massachusetts corporation with a usual place of business at 145 Hale Street #R, Beverly, MA 01915.

4.      BSWTLI has filed a Proof of Claim in the amount of $493,365.42.  BSWTLI is listed by the Debtor as the holder of a Judgment claim in the amount of $349,000.00.

5.      Trowt is the President and owner of 50% of the equity of BSWTLI.

6.      The Debtor is the owner of 50% of the equity of BSWTLI.

7.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§1334, 151 and 157, and the Order of Reference set forth in Rule 201 of the Local Rules of the United States District Court for the District of Massachusetts.  Further, this Court, pursuant to 11 U.S.C. §105(a), has equitable power to issue an order which is necessary and appropriate to carry out the provisions of 11 U.S.C. §§101, *et seq.*  This adversary proceeding relates to the above-referenced Chapter 7 bankruptcy case of the Debtor/Defendant, Richard J. Silva.

8.      This matter is a core proceeding pursuant to 28 U.S.C. Section 157(b).

9.      Venue is proper in this district pursuant to 28 U.S.C. Section 1409.

## ALLEGATIONS OF FACT[1]

*Beverly Storage Warehouse and Trailer Leasing, Inc.: Roles and Management*

10.     In 1993, Trowt and the Debtor formed a partnership when each purchased a fifty percent interest in BSWTLI.  (Ex. A at p. 4).

11.     BSWTLI is a small closely held corporation providing storage space to its customers in rental storage rooms at its warehouse located at 145 R Hale St., Beverly, Massachusetts, which is owned by the 145 Rear Hale Street Trust, of which Trowt and the Debtor each own 50% of the beneficial interest, and in storage trailers located in Manchester-by-the-Sea, Massachusetts.  (Id.)

12.     BSWTLI was later incorporated in 1997, and Trowt and the Debtor each became a fifty percent shareholder.  (Id. at p. 5).

13.     The agreement between Trowt and the Debtor with respect to BSWTLI was that all profits and losses would be split on a fifty-fifty basis.  (Id.).

---

[1] The facts provided herein are largely taken from the Findings of Fact, Rulings of Law, and Order for Judgment in the Massachusetts state court action, Trowt v. Silva, Essex County Superior Court Department, Civil Action No. 2011-01279 (the "State Court Action").  In the State Court Action, Trowt brought claims against the Debtor individually for Breach of Contract (Count III) and Breach of Fiduciary Duty (Count II), and derivatively on behalf of BSWTLI for Breach of Fiduciary Duty (Count I) and Conversion (Count IV).  A true and accurate copy of the Findings of Fact, Rulings of Law, and Order for Judgment from the State Court Action is attached hereto as **Exhibit A**.

14.     Beginning in 1993 and at all relevant times thereafter, the Debtor was responsible for all financial aspects BSWTLI, including, accounts receivable, accounts payable, and vendor payments, as well as other office administration tasks.  (Id.).

15.     The Debtor was the only person at BSWTLI with access to company passwords, bank accounts, credit cards, and payroll services. (Id.).

16.     The Debtor was the only person who dealt with BSWTLI's accountant and was responsible for all of the company's accounting functions.  (Id.).

17.     Trowt was responsible for generating business for BSWTLI.  (Id.).

*The Debtor Unilaterally Increases his Salary and Decreases Trowt's*

18.     Beginning in mid to late 2000, Trowt's BSWTLI salary was lowered and profits were being split at a sixty-five to thirty-five percent ratio in the Debtor's favor instead of 50/50, as had been the practice by agreement.  (Id. at p. 6).

19.     The Debtor made these changes without Trowt's knowledge or consent.  (Id.).

20.     From 2006 until November of 2011, the Debtor received a higher salary than Trowt; the ratio of the salary of the Debtor to the salary of Trowt during that time being seventy-five to twenty-five percent in the Debtor's favor.  (Id.).

21.     Trowt never knew of or agreed to this salary adjustment and did not discover the seventy-five twenty-five percent split until the latter part of 2010.  (Id.).

22.     When Trowt discovered the salary discrepancy he instructed the Debtor to equalize their salaries, pursuant to their agreement, but Silva refused.  (Id.).

23.     Moreover, the Debtor, who had sole control of BSWTLI's payroll, instructed Craig & Withers, BSWTLI's accountant, to ignore Trowt's demands for equal pay.  (Id.).

24.     When Trowt contacted Craig & Withers, he was informed by Craig & Withers that per the Debtor's instructions, they could not make any adjustments to his salary.  (Id.).

25.     Trowt and the Debtor's salaries were not equalized until November 2011, when Trowt obtained a preliminary injunction, in connection with the State Court Action, ordering the Debtor to make their salaries equal.  (Id.).

26.     From 2006 to November 2011, the Debtor received $359,575.00 in salary from BSWTLI while Trowt received only $141,250.00 in salary from BSWTLI.  (Id.).

27.     Thus, from 2006 to November 2011, when Trowt and the Debtor agreed to split profits on a fifty-fifty basis, when salaries were the only from of profit distribution BSWTLI

made, and when the Debtor was solely responsible for the company's payroll, the Debtor paid himself $218,325.00 more than he paid Trowt. (Id. at p. 7).

*The Debtor Embezzles Revenue from BSWTLI*

28.     In addition to paying himself a higher salary, the Debtor secretly siphoned revenue and cash from BSWTLI. (Id.).

29.     Between 2006 and 2011, according to business records, BSWTLI's revenue remained relatively flat, averaging approximately $200,000.00 per year. (Id.).

30.     Later, in late 2012, when Trowt took over the accounts receivable, including the responsibility for depositing all customer payments into BSWTLI's bank account, BSWTLI's revenue spiked. (Id.).

31.     In fact, annualizing the total deposits through August 2013, showed a nineteen percent increase in BSWTLI's revenue for 2013. (Id.).

32.     During the spike in revenue, BSWTLI made no operational changes other than the fact that Trowt began handling BSWTLI's deposits. (Id.).

33.     On this point, the Superior Court found, "being conservative, estimating the Debtor was skimming only ten percent from BSWTLI's revenues, there would have been an additional $140,815.20 in deposits for the period between January 2006 and December 2011." (Id.).

34.     The Debtor also, without any authority, used funds from BSWTLI to put a deposit on land he wished to purchase in Rowley, Massachusetts. (Id.).

35.     The Debtor's testimony in the State Court Action on the issue was contradictory and not credible. (Id.).

36.     First, the Debtor testified that there was only one piece of land that he wanted to purchase and that the only $5,000.00 check was shredded by the seller's real estate agent. (Id.).

37.     The Debtor then later testified that the $5,000.00 deposit check was returned. (Id.).

38.     When Trowt's counsel in the State Court Action showed the Debtor yet another $5,000.00 check, written off of BSWTLI's account, the Debtor admitted that he had placed a second $5,000.00 deposit on a second piece of land, which he forfeited. (Id. at p. 8).

39.     The Debtor also collected cash from BSWTLI's customers to bring with him on vacations he took. (Id.).

40.    At trial in the State Court Action, the Debtor's ex-wife, Mary Rees, testified that, prior to scheduled vacation trips, which occurred at least four times per year, the Debtor would hoard cash (at least $500.00) from BSWTLI's deposits for his own personal use. (Id.).

### The Debtor Misappropriates BSWTLI Assets for Personal Use

41.    Between 2006 and 2011, the Debtor opened at least five credit cards in BSWTLI's name. (Id.).

42.    The Debtor opened all of these credit accounts without informing Trowt of their existence. (Id.).

43.    The Debtor used BSWTLI's credit cards for numerous personal purchases including: dating websites, i.e., match.com and singlesnet.com. restaurants, motorcycles stores, Stop & Shop, numerous gas purchases, massage parlors, shoe polish, noise canceling headphones, numerous telephones, and other various purchases unrelated to the warehouse and storage business. (Id.).

44.    The Debtor made personal use of every credit account he opened in BSWTLI's name. (Id.).

45.    When questioned about these allegations at trial in the State Court Action, the Debtor had no credible explanation for the various personal charges; he could not recall what was purchased or, for example, credibly explain why BSWTLI's various credit accounts listed charges for restaurants, massage parlors, grocery stores, etc. (Id.).

46.    At trial in the State Court Action, the Debtor's ex-wife, Rees, testified that, during her marriage to the Debtor, he would regularly (at least monthly) use BSWTLI's credit cards at restaurants when paying for dinner and state words to the effect that "this one is on the warehouse." (Id.).

47.    The Debtor used at least $104,355.00 worth of BSWTLI's money for his own personal use. (Id.).

48.    These personal charges were split into four categories of misappropriation: (1) personal expenses, such as dating websites and department stores; (2) automotive expenses, such as gas purchases and automotive repairs; (3) unrelated office supply purchases; and (4) normal but excessive expenses. (Id. at 8-9).

49.    At trial in the State Court Action, Trowt's expert testified that, in reaching this total, she used conservative estimates and that, if she were able to obtain more credit card records the amount and number of the Debtor's personal charges would be even greater. (Id. at 9).

50.    The Court in the State Court Action explicitly credited this testimony. (Id.).

51.    Trowt never agreed that the Debtor could use BSWTLI's credit accounts for his own personal expenses or for expenses related to the Debtor's other business ventures.  (Id.).

52.    Upon the initiation of the State Court Action and cancellation of all of BSWTLI's credit accounts, all inappropriate and excessive charges stopped.  (Id.).

*Rulings of Law in the State Court Action*

53.    With respect to Trowt's claim for breach of fiduciary duty against the Debtor in the State Court Action (Count II), the Court in the State Court Action made the following findings:

> Through the evidence presented at trial, Trowt proved, by a preponderance of the evidence, that [the Debtor] breached the fiduciary duty he owed to him.  In particular, Trowt proved the following relevant facts: that, as of 1997, when [BSWTLI] was incorporated, he and [the Debtor] agreed to split profits on a fifty-fifty basis; that the only way [BSWTLI] distributed profits was through the payment of salaries; that [the Debtor] was solely responsible for the distribution of profits; and that [the Debtor] unilaterally decreased his (Trowt's) share of the profits by decreasing his (Trowt's) salary, and increasing his (the Debtor's) own salary.  **In paying himself a higher salary, i.e., splitting profits at a seventy-five to twenty-five percent ration in his favor, [the Debtor] clearly acted out of "avarice" and "self-interest" in derogation of the fiduciary duty he owed to Trowt.  Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty).**
>
> ***
>
> Thus, on Claim II (breach of fiduciary duty), judgment shall enter in favor of Trowt in the amount of $109,162.50.

Id. at p. 13 (emphasis added).

54.    Similarly, with respect to BSWTLI's derivative claim for breach of fiduciary duty against the Debtor in the State Court Action (Count 1), the Court in the State Court Action made the following findings:

> In addition, Trowt proved, by a preponderance of the evidence, that the Debtor breached the fiduciary duty he owed to [BSWTLI].  In fact, the evidence presented reveals two different, but related, bases for this claim.  First, the evidence at trial demonstrated that, between 2006 and 2011, while he was solely responsible for all financial matters related to [BSWTLI's] operations, including payroll and accounts receivable, [the Debtor] siphoned revenues and skimmed profits from the business.  Second, the evidence at trial demonstrated that, between this same time frame, [the

Debtor] opened numerous credit accounts in [BSWTLI's] name, which he used for his own personal use.  For example, the evidence showed [the Debtor] used [BSWTLI's] accounts to pay for dating websites, department store charges, grocery store charges, personal gas purchases, automotive repairs, and office supplies used in connection with [the Debtor's other business venture], his personal travel business.  **In engaging in this wrongdoing, [the Debtor] acted out of "avarice" and "self-interest," contrary to the fiduciary duty he owed [BSWTLI]. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty), as derivative of [BSWTLI].**

\*\*\*

Thus, on Claim I (breach of fiduciary duty) judgment shall enter in favor of Trowt, derivative of [BSWTLI], in the amount of $245,170.20.

Id. at p. 13-14 (emphasis added).

55.    With respect to Trowt's claim for breach of contract (Count III) and BSWTLI's claim for Conversion (Count IV) in the State Court Action, the Court in the State Court Action made the following findings:

Trowt's claim for breach of contract (Count III) and his derivative claim for conversion (Count IV) . . . are subsumed into the above analysis.  These claims assert the same theories of liability and request, essentially, the same relief.  For this reason, the court need not analyze them in detail.  Nevertheless, the court notes the following:  With respect to the breach of contract claims, judgment shall enter in favor of Trowt.  The evidence presented at trial demonstrated the following relevant facts: that Trowt and [the Debtor] had an agreement to split profits on a fifty-fifty basis; that Trowt and [the Debtor] had an agreement whereby [the Debtor] agreed to be responsible for the business's financial and administrative matters while Trowt served as the primary customer contract [sic]; that [the Debtor] breached this agreement by paying himself a larger salary and misappropriating funds belonging to [BSWTLI]; and that Trowt and [BSWTLI] were damaged as a result of [the Debtor's] conduct.  **Similarly, as to the conversion claim, judgment shall enter in favor of Trowt, as the evidence presented at trial demonstrated that [the Debtor] misappropriated money rightfully belonging to Trowt and [BSWTLI].**

Id. at p. 16 (emphasis added).

## CLAIMS

### COUNT I
### Determination of Nondischargeability of Claim of Peter B. Trowt Under 11 U.S.C. §523(a)(2)

56.   Plaintiffs hereby repeat and reallege the allegations contained in Paragraphs 1-55, as if fully set forth herein.

57.   The Debtor, by his actions summarized above and as enumerated in more detail in the Essex Superior Court's Findings of Fact and Conclusions of Law, a copy of which is attached hereto as "Exhibit A," the Debtor obtained unlawfully from Trowt and BSWTLI monies by false pretenses, false representations, and/or actual fraud.

58.   11 U.S.C. §523(a)(2) excepts from discharge a debt for money or property obtained by false pretenses, false representations, or actual fraud.

59.   The Plaintiff Trowt's claim for $710,601.65 should be declared nondischargeable under 11 U.S.C. §523(a)(2).

### COUNT II
### Determination of Nondischargeability of Claim of Beverly Storage Warehouse & Trailer Leasing, Inc. Under 11 U.S.C. §523(a)(2)

60.   Plaintiffs hereby repeat and reallege the allegations contained in Paragraphs 1-59, as if fully set forth herein.

61.   The Debtor/Defendant, by his actions summarized above, and as enumerated in more detail in the Essex Superior Court's Findings of Fact and Conclusions of Law, a copy of which is attached hereto as "Exhibit A," the Debtor obtained unlawfully from Trowt and BSWTLI monies by false pretenses, false representations, and/or actual fraud.

62.   11 U.S.C. §523(a)(2) excepts from discharge a debt for money or property obtained by false pretenses, false representations, or actual fraud.

63.   BSWTLI's claim for $493,365.42 should be declared nondischargeable under 11 U.S.C. §523(a)(2).

### COUNT III
### Determination of Nondischargeability of Claim of Beverly Storage Warehouse & Trailer Leasing, Inc. Under 11 U.S.C. §523(a)(4)

64.   Plaintiffs hereby repeat and reallege the allegations contained in Paragraph 1-63, as if fully set forth herein.

65.   At all times relevant, the Debtor/Defendant acted in a fiduciary capacity with respect to BSWTLI and Trowt, the co-owner of BSWTLI with the Debtor/Defendant.

66.    11 U.S.C. §523(a)(4) excepts from discharge a debt for fraud or defalcation while acting in a fiduciary capacity.

67.    As specifically found by the Essex Superior Court's Findings of Fact, Rulings of Law and Order for Judgment, a copy of which is attached hereto as "**Exhibit A**," the Debtor/Defendant, while acting in a fiduciary capacity, wrongfully siphoned, misappropriated, and embezzled funds from BSWTLI.  The claim of BSWTLI in the amount of $493,365.42 should, therefore, be declared nondischargeable under 11 U.S.C. §523(a)(4).

COUNT IV
Determination of Nondischargeability of Claim of Trowt Under 11 U.S.C. §523(a)(4)

68.    Plaintiffs hereby repeat and reallege the allegations contained in Paragraph 1-67, as if fully set forth herein.

69.    11 U.S.C. §523(a)(4) excepts from discharge a debt for fraud or defalcation while acting in a fiduciary capacity.

70.    The actions of the Debtor/Defendant in siphoning, embezzling and wrongfully misappropriating funds from BSWTLI constitute fraud or defalcation against Trowt, by the Debtor/Defendant, who was at all times relevant, acting in a fiduciary capacity with respect to Trowt.

71.    Therefore, Trowt's claim for $710,601.65 should be declared nondischargeable under 11 U.S.C. §523(a)(4).

WHEREFORE, the Plaintiffs request that the Court enter judgment against the Debtor as follows:

1.    On account of Count I, that the Court determine that the claim of Plaintiff Trowt in the amount of $710,601.65 is nondischargeable under 11 U.S.C. §523(a)(2), and award Plaintiff Trowt interest and costs, including reasonable attorneys' fees;

2.    On account of Count II, that the Court determine that the claim of Plaintiff BSWTLI in the amount of $493,365.42 is nondischargeable under 11 U.S.C. §523(a)(2), and award Plaintiff BSWTLI interest and costs, including reasonable attorneys' fees;

3.    On account of Count III, that the Court determine that the claim of Plaintiff BSWTLI in the amount of $493,365.42 is nondischargeable under 11. U.S.C. §523(a)(4), and award Plaintiff BSWTLI interest and costs, including reasonable attorneys' fees;

4.    On account of Count IV, that the Court determine that the claim of Plaintiff Trowt in the amount of $710,601.65 is nondischargeable under 11 U.S.C. 523(a)(4), and award Plaintiff Trowt interest and costs, including reasonable attorneys' fees; and

5.    That the Court grant such other and further relief as is just and proper.

Respectfully submitted,

PETER B. TROWT and BEVERLY
STORAGE WAREHOUSE & TRAILER
LEASING, INC.,
By their attorney,


/s/Christopher W. Parker
Christopher W. Parker (BBO #389720)
Law Offices of Christopher W. Parker
900 Cummings Center, Suite 207T
Beverly, MA 01915
Phone: 978-232-4201
Fax: 978-922-6464
Email: cparker@metaxasbrown.com

Dated:  November 8, 2018

# EXHIBIT A

27

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                    SUPERIOR COURT
                                              CIVIL ACTION
                                              NO. 2011-01279

PETER TROWT,
        Plaintiff/Defendant-in-Counterclaim,

v.

RICHARD SILVA,
        Defendant/Plaintiff-in-Counterclaim,

AND

BEVERLY STORAGE WAREHOUSE & TRAILER LEASING, INC.,
        Derivatively,

v.

TROWT MOVING & STORAGE, INC.,
        Third-Party Defendant.

### FINDINGS OF FACT, RULINGS OF LAW,
### AND ORDER FOR JUDGMENT

### INTRODUCTION

The plaintiff, Peter Trowt ("Trowt"), and the defendant, Richard Silva ("Silva"), each

own a fifty percent interest in Beverly Storage Warehouse & Trailer Leasing, Inc. ("Beverly

Storage"). This case involves the breakdown of their business relationship and the alleged

misappropriation of certain Beverly Storage assets. On November 8, 2011, Trowt filed the First

Amended Complaint and, on December 5, 2011, Silva filed the Amended Counterclaim and

Third Party Claim. In order to resolve this matter, the court held a five-day jury waived trial

between February 3, 2014 and February 10, 2014.

Trowt asserts claims against Silva, individually, for breach of fiduciary duty (Count II) and breach of contract (Count III), as well as derivatively, on behalf of Beverly Storage, for breach of fiduciary duty (Count I) and conversion (Count IV).  He also asserts a claim for an accounting.  Essentially, Trowt argues Silva violated his duty of utmost good faith and loyalty by misappropriating certain Beverly Storage assets to his (Trowt's) detriment.  Trowt accuses Silva of three basic categories of misconduct.  First, Trowt alleges that, contrary to their agreement to split profits fifty-fifty, Silva, who was responsible for all of Beverly Storage's financial matters, unevenly distributed company profits by paying himself a higher salary.  Second, Trowt claims that Silva siphoned cash from customer payments meant to be deposited in Beverly Storage's accounts.  Third, Trowt contends Silva misappropriated assets by using company credit cards to pay for personal items/expenses.  At trial, in support of these claims, Trowt offered the expert testimony of Kathy L. Parker ("Parker"), a certified public accountant with a Master of Science in Taxation.

Silva asserts claims against Trowt, individually, for breach of fiduciary duty (Counterclaim I) and breach of contract (Counterclaim III), as well as derivatively, on behalf of Beverly Storage, for breach of fiduciary duty (Counterclaim II).  In addition, Silva asserts a third-party claim against Trowt Moving & Storage, Inc. ("Trowt Moving"), which is Trowt's separately owned moving business, for breach of contract.  Basically, Silva claims Trowt breached his duties of good faith and loyalty and caused Beverly Storage and thus, him, economic harm by permitting Trowt Moving to use Beverly Storage's land and facilities without paying rent.  At trial, Silva offered no expert testimony or other evidence sufficient to support of these claims.  In particular, aside from his own speculations, he offered no evidence describing his measure of damages.

## FINDINGS OF FACT

Based upon the evidence presented at trial, including the credible testimony of each party's witnesses and the various exhibits that were submitted, the court makes the following findings of fact.

**The Parties and Relevant Business Entities:**

Trowt is an individual residing in Beverly, Massachusetts. At all times relevant to the current matter, Trowt has owned a fifty percent interest in Beverly Storage. Silva is an individual residing in Salem, Massachusetts. At all times pertaining to the current dispute, Silva has also owned a fifty percent interest in Beverly Storage. Beverly Storage is a small closely held corporation with a principal place of business at 145 Rear Hale Street, Beverly, Massachusetts.[1] Beverly Storage receives revenue from its customers in two ways: (1) from the rental of storage rooms at its warehouse in Beverly; and (2) from the rental of one of approximately forty-two various sized trailers, which it pays $2,000.00 per month to store at a rental location in Manchester-by-the-Sea, Massachusetts. Beverly Storage is named in this suit in order for the parties to obtain requested derivative relief.

Trowt Moving is a business entity formed under the laws of Massachusetts. It has a principal place of business also located at 145 Rear Hale Street. Trowt is the sole shareholder and President of Trowt Moving. Trowt Moving is a moving company that moves personal items belonging to its customers from one place to another. In the late 1980s, Silva worked for Trowt Moving. Then, in 1993, Trowt and Silva formed a partnership when each purchased a fifty percent interest in Beverly Storage. In 1993, Trowt and Silva also each purchased a fifty percent

---

[1] Beverly Storage only has two full time employees, Trowt and Silva, and one part time employee, a young woman who works part-time on Saturdays.

ownership interest in the land located at 145 Rear Hale Street, which is currently owned by a realty trust identified as the 145 Rear Hale Street Realty Trust (the "Realty Trust").[2]

In 1997, Trowt and Silva formally incorporated Beverly Storage and each became a fifty percent shareholder. In this case, Silva claims Trowt Moving unfairly and without compensation made use of Beverly Storage's land and facilities. The court finds that the evidence presented at trial demonstrated that there is a symbiotic relationship between Trowt Moving and Beverly Storage. Even before Trowt and Silva became partners and shareholders in Beverly Storage, Trowt Moving and Trowt accounted for the origination of approximately ninety-five percent of Beverly Storage's customers. To this day, Trowt and Trowt Moving are still responsible for the origination of a significant portion of Beverly Storage's business.

Trowt Moving also provided Beverly Storage with other benefits. For example, Trowt Moving regularly moves and transports trailers belonging to Beverly Storage, which contain goods and property belonging to Beverly Storage's customers, as Beverly Storage does not own its own tractor. In addition, Trowt Moving's employees regularly spend time performing tasks for Beverly Storage, getting customers to sign contracts, answering the office telephone, sending out bills, addressing customer concerns, and collecting certain fees. Beverly Storage does not pay Trowt Moving any money or reimburse it in any way for these tasks. Thus, the court finds that, to the extent that Trowt Moving may have benefited from its relationship with Beverly Storage, Beverly Storage benefited equally from the relationship.

---

[2] Currently, Trowt and Silva are the sole trustees and beneficiaries of the Realty Trust.

## TROWT'S CLAIMS

**Beverly Storage Management & Operations:**

Beverly Storage has only distributed profits in the form of weekly salaries. In 1993, when Trowt and Silva purchased Beverly Storage's assets, they agreed to split all the business profits and losses equally, on a fifty-fifty basis. Later, at some point in 1994, Trowt agreed to allow Silva to collect a higher salary than he (Trowt) was receiving, at a ratio of sixty-five (Silva) to thirty five (Trowt) percent. Nevertheless, thereafter, when Trowt and Silva officially incorporated the business in 1997, they reverted back to their original agreement that all profits and losses would be split on a fifty-fifty basis.

From the commencement of Trowt and Silva's partnership in 1993 until some point after the start of this litigation, Silva was responsible for all financial aspects of the company, including, accounts receivable, accounts payable, and vendor payments, as well as other office administration tasks. Silva was the only person at Beverly Storage with access to company passwords, bank accounts, credit cards, and payroll services. Silva was the only person who dealt with Beverly Storage's accountant and was responsible for all the company's accounting functions. Trowt, on the other hand, was responsible for generating business for Beverly Storage, which included providing estimates and maintaining good client relations.

Sometime in or about 2006 or 2007, after Silva started his own travel business, Clear Skys Travel ("Clear Skys"), the division of responsibilities began to shift. Trowt and Trowt Moving employees began assuming some of the office administration tasks Silva had typically completed, as he was no longer at the office on a full-time basis. By the time litigation began in 2011, Silva was, generally, not at Beverly Storage during the company's regular business hours, which required that Trowt or Trowt Moving's employees handle all day-to-day office

5

administration tasks.  Later, in or about late 2012, Trowt officially took over handling a majority

of the accounts receivable functions and processed a majority of all customer payments.

**Unequal Salaries:**

In 1993, when Trowt and Silva purchased Beverly Storage, they agreed to split profits

evenly, each receiving an equal salary.  At some point in 1994, Silva began receiving a higher

salary than Trowt, at a sixty-five to thirty-five percent ratio.  Thereafter, following the 1997

incorporation of Beverly Storage, Trowt and Silva agreed to go back to splitting profits on a

fifty-fifty basis.  By mid to late 1999, Trowt and Silva were receiving equal pay.  Sometime in

mid to late 2000, Trowt's salary was lowered and profits were being split at a sixty-five to thirty-

five percent ratio in Silva's favor.  Silva made this change without Trowt's knowledge or

consent.

From 2006 until November 2011, Silva received a higher salary than Trowt.  In fact,

between 2006 and late 2011, salaries were split between Trowt and Silva at a seventy-five to

twenty-five percent ratio favoring Silva.  Trowt never agreed to this salary adjustment and did

not discover the seventy-five twenty-five percent split until the latter part of 2010.  At that time,

Trowt instructed Silva to equalize their salaries, but he (Silva) refused.  In fact, Silva, who had

sole control of Beverly Storage's payroll, instructed Craig & Withers, Beverly Storage's

accountant, to ignore Trowt's demands for equal pay.  When Trowt contacted Craig & Withers,

he was informed that per Silva's instructions, they could not make any adjustments to his salary.

Trowt and Silva's salaries were not equalized until November 2011, when Trowt obtained a

preliminary injunction in connection with this case ordering Silva to make their salaries equal.

From 2006 to November 2011, Silva received $359,575.00 in salary from Beverly

Storage while Trowt received only $141,250.00 in salary from Beverly Storage. *Exhibit 17,*

*Parker, Expert Witness Report, October 14, 2013* (hereinafter, "*The Parker Report*"). Thus, from 2006 to November 2011, when Trowt and Silva agreed to split profits on a fifty-fifty basis, when salaries were the only form of profit distribution Beverly Storage made, and when Silva was solely responsible for the company's payroll, Silva paid himself $218,325.00 more than he paid Trowt. *Id.*

**Siphoning Revenue:**

In addition to paying himself a higher salary, Silva siphoned revenue and cash from Beverly Storage. Between 2006 and 2011, according to business records, Beverly Storage's revenue remained relatively flat, averaging approximately $200,000.00 per year. *The Parker Report*. Then, in late 2012, when Trowt took over the accounts receivable, including the responsibility for depositing all customer payments into Beverly Storage's bank account, revenue spiked. *Id.* In fact, annualizing the total deposits through August 2013, shows a nineteen percent increase in revenue for 2013. *Id.* During this spike in revenue, Beverly Storage made no operational changes other than the fact that Trowt began handling Beverly Storage's deposits. Being conservative, estimating Silva was skimming only ten percent from Beverly Storage's revenues, there would be an additional $140,815.20 in deposits for the period between January 2006 and December 2011. *Id.*

Silva also used funds from Beverly Storage to put a deposit on land he wished to purchase in Rowley, Massachusetts. Silva's testimony on this issue was contradictory and not credible. First, Silva testified that there was only one piece of land that he wanted to purchase and that the only $5,000.00 check was shredded by the seller's real estate agent. Then, he testified that the $5,000.00 deposit check was returned. When Trowt's attorney showed Silva

another $5,000.00 check, written off of Beverly Storage's account, Silva admitted that he had

placed a second $5,000.00 deposit on a second piece of land, which was forfeited.

Silva also collected cash from Beverly Storage's customers to bring with him on

vacation.  At trial, Silva's ex-wife, Mary Rees, testified that, prior to scheduled vacation trips,

which occurred at least four times per year, Silva would hoard cash (at least $500.00) from

Beverly Storage's deposits for his personal use.

**Misappropriation of Beverly Storage's Assets for Personal Use:**

Between 2006 and 2011, Silva opened at least five credit cards in Beverly Storage's

name.  Silva opened all of these credit accounts without informing Trowt of their existence.

Silva used Beverly Storage's credit cards for numerous personal purchases including: dating

websites, i.e., match.com and singlesnet.com, restaurants, motorcycle stores, Stop & Shop,

numerous gas purchases, massage parlors, shoe polish, noise canceling headphones, numerous

telephones, and other various purchases unrelated to the warehouse and storage business.  Silva

made personal use of every credit account he opened in Beverly Storage's name.  When

questioned about these allegations at trial, Silva had no credible explanation for the various

personal charges; he could not recall what was purchased or, for example, credibly explain why

Beverly Storage's various credit accounts listed charges for restaurants, massage parlors, grocery

stores, etc.[3]

Silva used at least $104,355.00 worth of Beverly Storage's money for his own personal

use.  *The Parker Report.*  These personal charges were split into four categories of

misappropriation: (1) personal expenses, such as dating websites and department stores; (2)

automotive expenses, such gas purchases and automotive repairs; (3) unrelated office supply

---

[3]  At trial, Silva's ex-wife, Rees, testified that, during her marriage to Silva, he would regularly (at least monthly)
use Beverly Storage credits cards at restaurants when paying for dinner and state words to the effect that "this one is
on the warehouse."

purchases; and (4) normal but excessive expenses. *Id.* Parker testified that, in reaching this total, she used conservative estimates and that, if she were able to obtain more credit card records the amount and number of Silva's personal charges would be even greater. The court credits this testimony. Trowt never agreed that Silva could use Beverly Storage's credit accounts for his own personal expenses or for expenses related to Clear Skys. Once this lawsuit began and Beverly Storage's credit accounts were cancelled, all inappropriate and excessive charges stopped.

SILVA'S COUNTERCLAIMS

**Permission to Park at 145 Rear Hale Street:**

Silva seeks $500.00 per week from Trowt Moving as payment for it parking eight pieces of equipment at 145 Rear Hale Street. Trowt Moving has parked its vehicles at 145 Rear Hale Street since 1993. There was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva that Trowt Moving would pay $500.00 per week to park its vehicles at 145 Rear Hale Street. During trial, Silva provided no evidence, aside from his own speculation, as to the reasonable value of the parking spaces Trowt Moving uses. Moreover, the only parking bill Silva presented is dated October 2013, which is two years after litigation commenced.

**Overnight Storage:**

Silva seeks overnight storage fees from Trowt Moving for it charging to keep customers' goods on its trucks parked at 145 Rear Hale Street for one or two nights when customers need to be out of their old home before they can move into their new home. Silva has known that Trowt Moving charges overnight storage fees since at least 2003. And, there was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva whereby Trowt Moving agreed to pay Beverly Storage overnight storage fees in these circumstances. At trial, aside from

his own speculation, Silva provided no evidence relating to the amount of damage Beverly

Storage sustained as a result of Trowt Moving's collection of overnight storage fees.[4]

**Office Space:**

Silva seeks monthly rental fees from Trowt Moving for its use of office space located at

145 Rear Hale Street. The office, which Trowt Moving uses, was constructed, built, and paid for

solely by Trowt Moving. And, there was never any formal agreement between Trowt

Moving/Trowt and Beverly Storage/Silva that Trowt would pay for the use of this office space.

During trial, Silva provided no evidence, aside from his own speculation, as to what would

constitute a reasonable rental fee for the office space Trowt Moving uses. Moreover, the only

office rental bill Silva presented is dated November 2011, right around the time Trowt

commenced this suit. See *Exhibit 22*.

**Miscellaneous Claims:**

Silva claims that a Trowt Moving employee damaged a trailer belonging to Beverly

Storage and that, Trowt Moving refused to pay for the damage. Silva has, however, known

about this alleged damage since 2005 and, at trial, he presented no evidence showing the damage

included or the cost of repairs.

Silva seeks to charge Trowt Moving for storing trailers at the location Beverly Storage

rents in Manchester-by-the-Sea. There was never any formal agreement between Trowt

Moving/Trowt and Beverly Storage/Silva that Trowt Moving would pay to store its trailers at the

Manchester-by-the-Sea location. This practice has been going on since before 2005 and Trowt

Moving has never been billed for storing its trailers at the Manchester-by-the-Sea location.

---

[4] Even if Trowt Moving collects overnight storage fees from its customers for property it allows them to store on its trucks for a day or two, there is no lost opportunity to Beverly Storage, as Beverly Storage does not have the manpower to unload/reload Trowt Moving's customers' goods into a Beverly Storage trailer, all to obtain a fee for one or two nights of storage.

Notably, at least one of Trowt Moving's trailers located in Manchester-by-the-Sea is full of goods belonging to a Beverly Storage customer and Beverly Storage receives all storage fees associated with the use of this trailer. Further, Beverly Storage does not own its own tractor, consequently, the only way the trailers belonging to Beverly Storage can be transported to and from Manchester-by-the-Sea is if Trowt Moving uses its tractor to move them.

Silva claims Trowt Moving stores various miscellaneous items belonging to it at 145 Rear Hale Street without Beverly Storage's permission. Based on the evidence presented at trial, the court concludes any miscellaneous property Trowt Moving stores at 145 Rear Hale Street is used for both Trowt Moving and Beverly Storage's customers, including the boxes, crates, pallet jack, padding and plastic wrap. The court further concludes that these items are commingled with similar items belonging to Beverly Storage and, thus, the items are not taking up space that Beverly Storage would otherwise be able to rent.

## RULINGS OF LAW

In this case, Trowt asserts individual claims against Silva for breach of fiduciary duty (Count II) and breach of contract (Count III) as well as derivative claims, on behalf of Beverly Storage, for breach of fiduciary duty (Count I) and conversion (Count IV). Meanwhile, Silva asserts individual claims against Trowt for breach of fiduciary duty (Counterclaim I) and breach of contract (Counterclaim III) as well as a derivative claim, on behalf of Beverly Storage, for breach of fiduciary duty (Counterclaim II). In addition, Silva asserts a third-party claim against Trowt Moving for breach of contract. Below, the court addresses each of these claims.

### I.    Breach of Fiduciary Duty (Counts I & II and Counterclaims I & II)

In a close corporation, shareholders owe to the other shareholders and the corporation a duty of utmost good faith and loyalty. *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*,

367 Mass. 578, 593 (1975), quoting *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952) (internal

quotations omitted).  Essentially, shareholders of a closely held corporation owe to the business

and their fellow shareholders "substantially the same fiduciary duty in the operation of the

enterprise that partners owe to one another." *Id.*  This requires that the shareholders place the

welfare of the business and that of the other shareholders ahead of their own personal interests.

*Demoulas* v. *Demoulas Supermarkets, Inc.*, 421 Mass. 501, 529 (1997).  Shareholders in a close

corporation are thus not permitted to frustrate the reasonable expectations of the other

shareholders with respect to share ownership, such as with regard to the fair distribution of

income and assets, shared decision-making, control of the business, and the receipt of fair value

for their contributions to the enterprise.  See, e.g., *Wilkes* v. *Springside Nursing Home, Inc.*, 370

Mass. 843, 850 (1976).  The law prohibits shareholders in a close corporation from acting out of

"avarice, expediency or self-interest" in derogation of their duty of loyalty to the corporation and

its other stockholders.  *Donahue*, 367 Mass. at 593.

 In the current matter, Trowt and Silva accuse each other of breaching the fiduciary duty

that shareholders in a close corporation owe to each other and the corporation.  The elements of

such a claim are: (1) the existence of a fiduciary duty, based upon the relationship of the parties;

(2) a breach of that duty; (3) damages; and (4) a causal connection between the breach of duty

and the damage suffered.  *Hanover Ins. Co.* v. *Sutton*, 43 Mass. App. Ct. 153, 164 (1989).  The

determination of whether a breach of fiduciary duty has occurred is a question of law for the

court, as is the remedy for such a breach.  See *Merola* v. *Exergen Corp.*, 423 Mass. 461, 461

(1996).  It is undisputed that Beverly Storage is a closely held corporation and that, as such,

Trowt and Silva owe each other and it a duty of utmost good faith and loyalty.  The only

questions left for the court to decide are who breached his fiduciary duty and who is entitled to

recover damages.

**Trowt's Claims:**

Through the evidence presented at trial, Trowt proved, by a preponderance of the

evidence, that Silva breached the fiduciary duty he owed him.  In particular, Trowt proved the

following relevant facts: that, as of 1997, when Beverly Storage was incorporated, he and Silva

agreed to split profits on a fifty-fifty basis; that the only way Beverly Storage distributed profits

was through the payment of salaries; that Silva was solely responsible for the distribution of

profits; and that Silva unilaterally decreased his (Trowt's) share of the profits by decreasing his

(Trowt's) salary, and increasing his own salary.  In paying himself a higher salary, i.e., splitting

profits at a seventy-five to twenty-five percent ratio in his favor, Silva clearly acted out of

"avarice" and "self-interest" in derogation of the fiduciary duty he owed Trowt.  Consequently,

Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty).

As no contrary evidence was presented at trial on the issue of damages, as a starting

point, the court accepts the figures set forth in *The Parker Report*.  From 2006 to November

2011, contrary to their agreement to split profits, i.e., to split salaries, on a fifty-fifty basis, Silva

paid himself $359,575.00 in salary while he paid Trowt only $141,250.00.  A fifty-fifty split

would have resulted in Trowt and Silva each receiving $250,412.50.  Thus, on Claim II (breach

of fiduciary duty), judgment shall enter in favor of Trowt in the amount of $109,162.50.

In addition, Trowt proved, by a preponderance of the evidence, that Silva breached the

fiduciary duty he owed Beverly Storage.  In fact, the evidence presented reveals two different,

but related, bases for this claim.  First, the evidence at trial demonstrated that, between 2006 and

2011, while he was solely responsible for all financial matters related to Beverly Storage's

operations, including payroll and accounts receivable, Silva siphoned revenues and skimmed

profits from the business.  Second, the evidence at trial demonstrated that, between this same

time frame, Silva opened numerous credit accounts in Beverly Storage's name, which he used

for his own personal use.  For example, the evidence showed Silva used Beverly Storage's

accounts to pay for dating websites, department store charges, grocery store charges, personal

gas purchases, automotive repairs, and office supplies used in connection with Clear Skys, his

personal travel business.  In engaging in this wrongdoing, Silva acted out of "avarice" and "self-

interest," contrary to the fiduciary duty he owed Beverly Storage.  Consequently, Trowt is

entitled to judgment in his favor on Count II (breach of fiduciary duty), as derivative of Beverly

Storage.

Again, as no contrary evidence was presented at trial on the issue of damages, as a

starting point, the court references *The Parker Report*.  If Silva had properly deposited all funds

he received into Beverly Storage's account for the period 2006 to November 2011, there would

have been an additional $140,815.20 in deposits.[5]  And, if Silva had not used Beverly Storage's

money for his own personal use, the company would also have had another $104,355.00 in

revenue.  Thus, on Claim I (breach of fiduciary duty) judgment shall enter in favor of Trowt,

derivative of Beverly Storage, in the amount of $245,170.20.

**Silva's Counterclaims:**

On Counterclaims I and II, judgment shall enter in favor of Trowt.  Silva failed to provide

sufficient evidence to demonstrate Trowt breached the fiduciary duty he owed him or Beverly

Storage.  These claims are premised upon several different theories.  First, Silva claims Trowt

---

[5]  *The Parker Report* states that, but for Silva's siphoning of revenue, there would have been an additional
$211,223.00 in deposits between 2006 and 2011.  This figure is based upon Parker's estimate that Silva was
skimming approximately fifteen percent from Beverly Storage's annual profits.  To be conservative, and to take into
account the fact that profits for 2013 did not actually show a nineteen present increase, as Parker predicted they
would, the court reduces the fifteen percent to ten percent.

breached his fiduciary duty by parking/storing Trowt Moving equipment at 145 Rear Hale Street
without paying rent. Second, he claims Trowt breached his fiduciary duty by leaving storage
trailers at the Manchester-by-the-Sea location without paying rent. Third, he claims Trowt
breached his duty by failing to pay rent for office space he uses at 145 Rear Hale Street.

These assertions fail with little analysis. At trial, Silva failed to establish that there was
ever any agreement between Trowt/Trowt Moving and Beverly Storage/Silva whereby Trowt
Moving would pay to park its equipment at 145 Rear Hale Street, pay to store trailers at the
Manchester-by-the-Sea location, or pay to rent office space at 145 Rear Hale Street. Rather, the
evidence established that Trowt Moving and Beverly Storage have a symbiotic relationship. And
that, to the extent Trowt Moving benefited from its relationship with Beverly Storage, Beverly
Storage equally benefited from that relationship. An example of this symbiotic relationship is
demonstrated by the fact that Beverly Storage does not even own a tractor to move its trailers
and thus, the only way the storage trailers can be moved from the warehouse in Beverly to the
location in Manchester-by-the-Sea is by using Trowt Moving's tractor.

Last, Silva argues that, in charging Trowt Moving customers overnight storage fees,
Trowt usurped a corporate opportunity from Beverly Storage. This claim appears to be premised
on the idea that, if Trowt did not allow its customers to store their items in its trucks overnight,
the customers would pay to store their items at Beverly Storage. This claim is without merit.
While it is true that a shareholder breaches "his fiduciary duty by acquiring or diverting a
corporate business opportunity for his personal profit[,]" the fact that the corporation would not
have been able to avail itself of that opportunity is a defense to such a claim. *Puritan Med. Ctr.,
Inc.* v. *Cashman*, 413 Mass. 167, 177-178 (1992). The evidence presented at trial establishes
that this was the case in the current matter. Even assuming Trowt Moving's customers would

15

choose to rent space at Beverly Storage, Beverly Storage did not have the manpower and

resources to unload and reload Trowt Moving's trucks all to obtain a one or two-day storage fee.[6]

## II.    Breach of Contract and Conversion

Trowt's claim for breach of contract (Count III) and his derivative claim for conversion

(Count IV) as well as Silva's counterclaim for breach of contract (Counterclaim III) are

subsumed into the above analysis.  These claims assert the same theories of liability and request,

essentially, the same relief.  For this reason, the court need not analyze them in detail.

Nevertheless, the court notes the following: With respect to the breach of contract claims,

judgment shall enter in favor of Trowt.  The evidence presented at trial demonstrated the

following relevant facts: that Trowt and Silva had an agreement to split profits on a fifty-fifty

basis; that Trowt and Silva had an agreement whereby Silva agreed to be responsible for the

business's financial and administrative matters while Trowt served as the primary customer

contract; that Silva breached this agreement by paying himself a larger salary and

misappropriating funds belonging to Beverly Storage; and that Trowt and Beverly Storage were

damaged as a result of Silva's conduct.  Similarly, as to the conversion claim, judgment shall

enter in favor of Trowt, as the evidence presented at trial demonstrated that Silva

misappropriated money rightfully belonging to Trowt and Beverly Storage.

## III.    Silva's Third-Party Claim Against Trowt Moving for Breach of Contract

Silva asserts a third-party claim against Trowt Moving for breach of contract in

connection with Trowt Moving's failure to pay for parking its vehicles at 145 Rear Hale Street,

failing to pay to store its trailers at the Manchester-by-the-Sea location, and for failing to pay

rent for the use of office space at 145 Rear Hale Street.  This claim fails.  To establish a claim for

---

[6] Even if Silva had presented sufficient evidence to factually support his claims for breach of fiduciary duty, Counterclaim II, asserted derivatively on behalf of Beverly Storage, would still fail, as he did not send a demand letter as Mass. R. Civ. P. 23.1 requires.

breach of contract, a plaintiff must demonstrate the following: (1) an agreement exists between

the plaintiff and the defendant; (2) the plaintiff fully performed his obligations under the

agreement; (3) the defendant breached the agreement; and (4) the plaintiff suffered damages as a

result of the breach.  See *Singarella* v. *Boston*, 342 Mass. 385, 387 (1961); see also Richard W.

Bishop, Prima Facie Case § 2.1, at 13 (2005).  At trial, Silva failed to provide sufficient evidence

to demonstrate there was ever any agreement between Trowt/Trowt Moving and Beverly

Storage/Silva regarding parking, rental payments, or storage fees.[7]  Instead, the evidence

demonstrated that Trowt Moving and Beverly Storage worked in a symbiotic relationship where

each used the services and facilities of the other on an as needed basis with no formal

reimbursement.  Judgment shall enter in favor of Trowt Moving on the third party claim for

breach of contract.

## IV.    Accounting

Trowt has sought an accounting in this matter.  An accounting is proper where a

violation of a fiduciary relationship has been established, but reconciling the rights and

obligations of the parties is so complicated that it cannot be conveniently accomplished by the

court.  See *In re Evangelist*, 760 F.2d 27, 29-30 (1st Cir. 1985); *Crane* v. *Royster*, 255 Mass.

118, 120 (1926).  This is not the case here.  Instead, in this case, an accounting appears

unnecessary.  The evidence demonstrates that Trowt is entitled to damages in the amount of

$109,162.50 for his direct claim of breach of fiduciary duty and in the amount of $245,170.20 for

the claim of breach of fiduciary duty, which he asserts derivatively on behalf of Beverly Storage.

---

[7]  The only evidence Silva presented in support of the existence of some agreement between Trowt/Trowt Moving and Beverly Storage/Silva regarding the payment of rent are monthly statements, which include an attached transaction history.  The court does not find these monthly statements to be credible.  The statements identify a due date of December 8, 2006, but are themselves dated in 2011 around the time litigation in this matter began.  Such discrepancies with the dates inevitably leads to the inference that these monthly statements are not accurate invoices from the time period in question but, rather, were created solely in connection with the present litigation.

## ORDER

Based upon the findings of fact and rulings of law made after trial on the merits, the court shall enter judgment in favor of Trowt as to all claims he asserts individually against Silva as well as to those he asserts derivatively on behalf of Beverly Storage.  Judgment shall also enter in favor of Trowt as to all counterclaims Silva asserts individually against him as well as to those Silva asserts derivatively on behalf of Beverly Storage.  Finally, judgment shall enter in favor of Trowt Moving as to Silva's third-party claim for breach of contract.  Specifically with respect to Trowt's claim for breach of fiduciary duty, judgment shall enter against Silva in the amount of $109,162.50.  And, as to the claim for breach of fiduciary duty Trowt asserts as derivative of Beverly Storage, judgment shall enter against Silva in the amount of $245,170.20.  Judgment is **ORDERED** entered accordingly upon the docket by the clerk magistrate and notice shall be provided to the parties pursuant to Mass. R. Civ. P. 58.

SO ORDERED :

Date:  October 31, 2014

_____
Hon. Robert A. Cornetta
Justice

18